# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **APRIL EDWINA SPARKS AKERS**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08CV00039 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **HIGHLANDS COMMUNITY** | ) | By: James P. Jones |
| **SERVICES BOARD,** | ) | Chief United States District Judge |
| | ) | |
| Defendant. | ) | |

*E. Gay Leonard, Abingdon, Virginia, for Plaintiff; Henry S. Keuling-Stout, Keuling-Stout, P.C., Big Stone Gap, Virginia, for Defendant.*

In this employment discrimination and retaliation case brought pursuant to Title VII, the defendant has moved for summary judgment. For the reasons that follow, the motion will be granted.

I

In the present suit, the plaintiff, April Edwina Sparks Akers, claims that she was sexually harassed by a co-worker and as a result of complaining about the harassment, wrongfully terminated by her employer, the defendant, Highlands Community Services Board (the "Board"). The Board has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(b). Jurisdiction

is vested in this court pursuant to 28 U.S.C.A. § 1331 (West 2006). The parties have briefed the issues, oral argument was presented, and the motion is now ripe for decision.

The facts, either uncontradicted or viewed in the light most favorable to Akers as the non-moving party,[1] are as follows:

The Board is a non-profit agency serving Washington County and Bristol, Virginia. In July 2002, Akers was hired as a case manager to provide mental health services to the Board's clients. During her tenure with the Board, Akers shared an office with a co-worker named Fred Jackson. In late 2003 and early 2004, Fred Jackson made several sexually-charged comments to Akers. Although Akers asked Fred Jackson to stop, he did not, and eventually Akers went to her immediate supervisor, Patty Jackson (no relation to Fred Jackson) for help.

The first time Akers reported Fred Jackson's conduct, Patty Jackson defended him, asserting that he was only kidding. After Akers complained again, Patty Jackson reiterated that Akers was overreacting and that Fred Jackson's comments were merely jokes. Finally after Akers's third complaint, Patty Jackson reported the incident to

---

[1] In evaluating a motion for summary judgment, "a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party." *Earley v. Marion*, 540 F. Supp. 2d 680, 684 (W.D. Va. 2008), *aff'd*, No. 08-1391, 2009 WL 2353255 (4th Cir. July 28, 2009) (unpublished).

her own supervisor, Fay Morris. Morris and Patty Jackson confronted Fred Jackson about Akers's allegations, and he denied making the remarks. Then Morris arranged a meeting between herself, Patty Jackson, Akers, and Fred Jackson. Fred Jackson did not admit he made any inappropriate remarks, but he apologized to Akers for anything she had misunderstood. Morris and Patty Jackson reported that the apology satisfied Akers, but after the meeting, Akers requested a new office. Patty Jackson offered Akers a spot on the second floor, but due to a recent surgical procedure, Akers could not walk upstairs and was forced to decline. Patty Jackson said she did not have any other place to move Akers, and so Akers remained with Fred Jackson. Akers never filed any written grievance about his comments nor did she make any further oral complaints. Sometime in 2004, Fred Jackson quit his job for health reasons.

Even though her difficulties with Fred Jackson ended, Akers's issues with Patty Jackson continued. Patty Jackson told Akers that "[Akers] made her look bad" because Patty Jackson was forced to inform Morris of Akers's complaints against Fred Jackson. (Akers Dep. 18:18-20, Sept. 1, 2009.) Akers felt "like [Patty Jackson] was harassing [her] repeatedly at work" and "retaliat[ing] against [her] for reporting" the Fred Jackson incidents. (*Id.* at 18:14-22.) Patty Jackson "was putting more work on [Akers] than [Akers] thought was fair." (*Id.* at 26:3-4.) Akers heard from co-

workers that Patty Jackson had said that "she was trying to get [Akers] fired." (*Id.* at 17:1-4.) Despite Patty Jackson's conduct, Akers testified that she was able to perform her job duties and serve her clients.

For the two years following Fred Jackson's departure, reviews of Akers performance were mixed. While she was noted to be a good case manager and credited with handling some of the Board's more difficult clients, she had trouble interacting professionally with her co-workers. In weekly supervisor's logs documenting Akers performance, Akers was reminded more than once "to maintain a positive attitude and work as a team member," resolve her conflicts with others in the office, avoid negative office gossip, and refrain from doing her school work during work hours. (Def.'s Reply, Ex. H.)

The issues with Akers's attitude came to a head when, on October 10, 2006, the Board's program director, Carolyn Peterson, conducted interviews of three candidates for a care coordinator position. Several staff members, including Akers, were expected to participate. During the first interview, Peterson asked the staff to introduce themselves to the candidate. Akers stated her name without her title and pointed to her office as "where [she] live[d]" in what Peterson characterized as an "unprofessional, unwelcoming" manner. (Mot. Summ. J., Ex. E.) Akers then described her typical day by focusing on her negative experiences, and she was

warned by Peterson not to "scare the applicant." (*Id.*) Akers also asked the applicant forbidden personal questions during the interview, such as whether or not she was married, what her husband did for a living, and whether she had children.

After the conclusion of the first interview, Peterson confronted Akers and another employee about their unprofessional conduct. Peterson requested that Akers attend the next two interviews but also told Akers to refrain from asking any personal questions and to conduct herself in a professional manner. Akers, however, appeared only briefly during the second and third interviews, merely introducing herself to the candidate while standing in the doorway and then leaving.

Peterson reported Akers's unacceptable behavior to the Board's executive director, Jeffrey Fox, who only began working for the Board on September 1, 2006. Fox then began an investigation into Akers's job performance. Fox had met Akers at the beginning of his tenure and noted her unprofessionalism, but he was unaware that Akers had made any complaints of sexual harassment.

On October 19, 2006, at Akers's request, Fox and human resources manager, Lori Foster, met with Akers to discuss issues she was having with other staff members. At the meeting, Akers informed Fox and Foster that Patty Jackson was repeatedly harassing her at work and that she felt that she was being retaliated against for reporting Fred Jackson's sexual comments. After reviewing Akers's personnel

file, Fox concluded that Akers conduct during the interviews constituted insubordination and that Akers had been warned about her negative influence on the office environment in the past but refused to change. Consequently, on October 26, 2006, Fox terminated Akers's at-will employment with the Board.

On December 20, 2006, Akers filed a charge of discrimination with the Equal Opportunity Employment Commission (the "EEOC") alleging that she had been unlawfully discharged in retaliation for her earlier complaints about sexual harassment. The EEOC was unable to conclude that Akers's termination violated Title VII, dismissing her claim on June 27, 2008, and informing her of her right to sue as an individual.

II

In this action, Akers asserts that: (1) Fred Jackson's sexual advances in late 2003 and early 2004 constituted employment discrimination on the basis of sex, a violation of § 703 of Title VII, 42 U.S.C.A. § 2000e-2 (West 2003); and (2) she was terminated in retaliation for her complaints about Fred Jackson's unlawful behavior in violation of § 704 of Title VII, 42 U.S.C.A. § 2000e-3 (West 2003). For the reasons detailed below, I award the Board summary judgment on both these claims.

A

First, Akers's discrimination claim is procedurally barred because she failed to file a timely complaint with the EEOC about the incidents with Fred Jackson. To bring an action against an employer for discrimination under § 2000e-2, an employee in Virginia must file a charge with the EEOC within 300 days of the alleged infraction. *See Edelman v. Lynchburg Coll.*, 535 U.S. 106, 109 & n.1 (2002). However, Akers failed to ever file a charge with the EEOC about the harassment. Though Akers filed a charge with the EEOC on December 20, 2006, alleging retaliatory discharge, she never filed one regarding the alleged sexual harassment by Fred Jackson. Even if Akers intended the December 20, 2006 charge to include an accusation of discrimination, Akers admits that Fred Jackson made the sexual remarks to her no later than the first few months of 2004—well more than 300 days past the alleged discrimination and therefore, too late to save her claim.

B

Akers's second claim also fails because she has not presented evidence sufficient to make out a prima facie case of retaliatory discharge. To prevail against a motion for summary judgment, the non-moving party must "'make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Earley*, 540 F. Supp. 2d

at 684 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). A party cannot rely on speculative allegations or "conclusory statements, without specific evidentiary support," to overcome this burden. *See Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998). Evidence must be probative and concrete to demonstrate a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). After all, "[s]ummary judgment is not 'a disfavored procedural shortcut,' but an important mechanism for weeding out 'claims and defenses [that] have no factual basis.'" *Earley*, 540 F. Supp. 2d at 684 (second alteration in original) (quoting *Celotex*, 477 U.S. at 327).

The elements of a retaliation claim are outlined by section 704(a) of Title VII, which provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice" prohibited by Title VII. 42 U.S.C.A. § 2000e-3(a) (West 2003). To establish a prima facie case, the plaintiff must show that: (1) she engaged in protected activity under Title VII; (2) her employer took adverse action against her; and (3) the protected activity and the adverse action were causally connected. *Martin v. Merck & Co.*, 446 F. Supp. 2d 615, 636 (W.D. Va. 2006). If the plaintiff succeeds, "then the burden shifts to the defendant employer to articulate a legitimate, non-retaliatory reason for the adverse action." *Id*. If the defendant offers an appropriate justification,

then the burden returns to plaintiff to demonstrate that the defendant's explanation is merely a pretext for retaliation. *Id.*

The Board asserts that Akers has failed to overcome her first hurdle: she has not established a prima facie case because she has not presented evidence sufficient to demonstrate a causal connection between her purported protected activity (complaining about harassment to her superior) and the Board's adverse action (terminating Akers).[2] I agree.

To establish causality, the protected activity "must have actually played a role in the employer's decision-making process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (internal quotation marks and alteration omitted); *see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 286 (4th Cir. 2004). "It is the perception of the decision maker which is relevant to the question of retaliation, not the opinions of [the plaintiff's] co-workers or other third parties." *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). "[A]n employer will be liable not

---

[2] The Board concedes Akers's termination qualifies as an adverse action under the second element of the prima facie case.

for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision." *Hill*, 354 F.3d at 291.

In this case, the undisputed evidence shows that executive director Fox *alone* made the decision to terminate Akers, but Akers does not claim he had any retaliatory motive. She claims only Patty Jackson harbored any grudge against her for her sexual harassment complaints. Nonetheless, Akers insists there is a causal connection between Fox's decision to fire her and Patty Jackson's retaliation. Akers's theory is that "[Patty] Jackson availed herself of the opportunity to carry out her threats to cause plaintiff to be fired." (Pl.'s Resp. Opp. Summ. J. 4.) But Akers does not explain, or offer evidence to elucidate, *what* the opportunity was or *how* Patty Jackson took advantage of it to affect Fox's decision.

Importantly, the impetus to terminate Akers had no connection to Patty Jackson. It was Akers's conduct during the care coordinator interviews that prompted Fox to investigate Akers's performance, and this event was the main basis for firing Akers. However, it was Peterson, not Patty Jackson, who found Akers's behavior at the interviews inappropriate and wrote her up for it. There is no evidence that Patty Jackson was present during the interviews. Nor is there any evidence that Peterson was even aware of Akers's sexual harassment complaints or was in any way encouraged by Patty Jackson to reprimand Akers. Also, Akers does not argue that

Patty Jackson's retaliation was somehow to blame for Akers's unprofessional conduct.

The only way in which Akers shows Patty Jackson may have influenced Fox's decision is through the supervisor's logs authored by Patty Jackson. Fox admits he reviewed these logs during his investigation. These logs document issues discussed each week between an employee and her immediate supervisor. Although the logs are filled out by the supervisor, there is a place on the forms where the employee is permitted to make comments. After the weekly log is completed, both the supervisor and the employee sign it.

In the weekly logs documenting the topics discussed between Akers and Patty Jackson from October 2005 to September 2006, Patty Jackson consistently noted problems with Akers's professionalism in the office. Notably, Akers does not contend that Patty Jackson manufactured any of the issues noted in the logs in retaliation for Akers's harassment complaints. Akers signed each of these logs and never used the employee comment section to dispute Patty Jackson's version of events. Akers also admits that her job performance was not affected by Patty Jackson's actions. Moreover, Akers specifically notified Fox and Foster of Patty Jackson's alleged "campaign of retaliation" in their October 19 meeting. (Compl. 4.)

Thus, Fox was aware in reading Akers's logs that Patty Jackson may have been biased against Akers.³

The facts here are comparable to those in *Maiden v. County of Albemarle*, 3:09cv34, 2009 WL 2511951, at *5 (W.D. Va. Aug. 17, 2009). In *Maiden*, the plaintiff claimed he was unlawfully discharged because of complaints he made to his superiors about a co-worker's sexual harassment. *Id.* at *4. One supervisor, while investigating the plaintiff's accusations, threatened that "he would do everything he could to get [the plaintiff] fired." *Id.* at *5. Approximately two years later the plaintiff was terminated. Reviewing the parties' pleadings, the court found that the supervisor's threat by itself was insufficient to establish causation. *Id.* at *5-*6. There were no allegations that the supervisor who made the remark was actually involved in making the decision to terminate or that the supervisor took any steps to achieve the threat. In addition, over two years passed between the threat and the plaintiff's termination. *Id.* Accordingly, the court dismissed the claim. *Id.*

Similarly, in this case, Akers has failed to show that her "retaliating" supervisor, Patty Jackson, was actually involved in the decision-making process. Just like the plaintiff in *Maiden*, Akers accuses Patty Jackson only of making sporadic

---

³ Akers claims that Foster said that she and Fox did not believe Akers's accusations against Patty Jackson. Akers admits that Foster and Fox were not upset or angered by her accusations. Thus, even if Foster's statement were true, there is no evidence that the disbelief motivated either Fox or Foster to fire her.

threats and negative comments, but cannot point to any specific retaliatory act of Patty Jackson.[4] Here too, as in *Maiden*, the lengthy time period between when Akers reported her problems with Fred Jackson (early 2004) and when she was discharged (late 2006) weighs against causality. 2009 WL 2511951, at *6 ("The lack of allegations of direct evidence of retaliation in combination with the lapse of time between [the plaintiff's] initial complaints of sexual harassment and his ultimate termination suggests that his termination was not in retaliation for his protected Title VII activity."); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("Action taken . . . 20 months [after the protected activity] suggests, by itself, no causality at all."). Consequently, there is not sufficient evidence for a reasonable jury to conclude that Akers's discharge was caused by Patty Jackson's retaliation.[5]

Nevertheless, even if Akers established causality, she has not shown that the Board's justification for her termination was merely a pretext for retaliation. In Fox's affidavit, he cites Akers's insubordination on October 10, as well as her unwillingness to alter her negative, unprofessional influence on the office

---

[4] Akers does claim that Patty Jackson gave her more work than other case managers, but if anything this reflected positively on Akers, because she became known as someone who could handle a high caseload and difficult cases. (Morris Dep. 11:19-12:3, Sept. 1, 2009.)

[5] The Board also argues that Akers has failed to prove that her complaints to Patty Jackson were a protected activity. Because I find that the third element has not been adequately proven, I do not reach this issue.

environment, as the determining factors for her discharge. Akers has not put forward any evidence to counter Fox's assessment. Therefore, the legitimate basis for Akers's termination is unchallenged. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (stating that "mere knowledge on the part of an employer that an employee has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for adverse personnel action against that employee" (internal quotation marks and alteration omitted)).

Accordingly, I find that Akers has failed to establish a prima facie case of retaliation, or demonstrate the Board's justification for her discharge was merely a pretext, and I will award summary judgment to the Board on this claim.

III

For the foregoing reasons, the defendant's Motion for Summary Judgment will be granted and judgment consistent with this Opinion will issue forthwith.

DATED: January 15, 2010

/s/ JAMES P. JONES
Chief United States District Judge